AO 91 (Rev. 12/03) Criminal Complaint

OCT 2 8 2011

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
_____ DEPUTY CLERK

# United States District Court

**EASTERN**     District of     **CALIFORNIA**

| UNITED STATES OF AMERICA | CRIMINAL COMPLAINT |
|---|---|
| V. | |

VICTOR MANUEL TORRES,
FERNANDO QUINTERO, AND
ALFONSO MINJARES ESTRADA
(Name and Address of Defendant)

Case Number:
1: 11 MJ 00228 BAM

I, the undersigned complainant state that the following is true and correct to the best of

my knowledge and belief. On or about <u>beginning at a time unknown and continuing to the</u> <u>present</u> in <u>Fresno, Kings, and Stainislaus</u> County,
    (Date)

in the     **EASTERN**     District of     **CALIFORNIA**     defendant(s) did,

*(Track Statutory Language of Offense)*
knowingly and intentionally conspire to possess with the intent to distribute and distribute methamphetamine, a Schedule I controlled substance, and other controlled substances

in violation of Title <u>21</u> United States Code, Section (s) <u>841(a)(1), 841(b)(1)(A), and 846.</u>
I further state that I am a(n) <u>Special Agent with the Drug Enforcement Administration</u> and that this complaint is based on the following facts:
    Official Title

See Attachment A (AFFIDAVIT OF CHRISTOPHER B. MULLIGAN IN SUPPORT OF COMPLAINT)

Continued on the attached sheet and made a part hereof.     ☒ Yes ☐ No

_____
Signature of Complainant

CHRISTOPHER B. MULLIGAN
Printed Name of Complainant

Sworn to before me and subscribed in my presence,

Date   10/28/11      at   Fresno      Ca
                                       City                 State

_____     _____
Name of Judge            Title of Judge            Signature of Judge

BENJAMIN B. WAGNER
United States Attorney
YASIN MOHAMMAD
Assistant U.S. Attorney
4401 Federal Building
2500 Tulare Street
Fresno, California 93721
Telephone: (559) 497-4000

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE CRIMINAL COMPLAINT AGAINST: | ) CASE NO. |
| | ) |
| | ) **ATTACHMENT A** |
| | ) |
| (1) VICTOR MANUEL TORRES | ) **AFFIDAVIT OF CHRIS** |
| | ) **MULLIGAN, SPECIAL AGENT FOR** |
| (2) FERNANDO QUINTERO | ) **THE DRUG ENFORCEMENT** |
| | ) **ADMINISTRATION, IN SUPPORT** |
| (3) ALFONSO MINJARES ESTRADA | ) **OF CRIMIANAL COMPLAINT** |
| | ) |
| | ) **UNDER SEAL** |
| | ) |

## I.   INTRODUCTION

I, Chris Mulligan, a Special Agent of the Drug Enforcement Administration, being duly sworn, depose and state:

1.    I, Chris Mulligan, am presently employed by the United States Department of Justice, Drug Enforcement Administration (DEA), San Francisco Divisional Office as a Special Agent (SA) and have been so employed since January of 2005. I have been assigned to the Oakland Resident Office since July of 2005. In addition to my experience with the DEA, I was a certified Peace Officer in the State of Illinois for five (5) years. I was employed by DuPage County State's Attorney's Office as a Senior Criminal Investigator for the DuPage County Children's Center. My duties with the DuPage County Children's Center were to investigate severe cases of physical and sexual abuse to

1

include homicide of children within DuPage County. During that time I investigated numerous felonies, interviewed and arrested numerous persons for felony crimes to include crimes of violence, such as Predatory Criminal Sexual Assault of a Child. Prior to that, I was a Police Officer with DuPage County Forest Preserve District for two (2) years. During that time I have arrested numerous persons for minor drug related offenses.

2.    In connection with my official DEA duties, I investigate criminal violations of the federal narcotics laws, including, but not limited to, Title 21, United States Code, and Sections 841, 843, 846 and 848. As a DEA Special Agent, I have been the case agent for, or have assisted in narcotics investigations which have led to the seizure of narcotics and arrests of numerous individuals. I have discussed with numerous law enforcement officers, cooperating defendants, and informants, the method and practices used by narcotics distributors. In addition, I am familiar with narcotics traffickers' method of operation including, the manufacturing, distribution, storage, and transportation of narcotics, and the collection of money which represents the proceeds of narcotics trafficking, and money laundering. I have participated in, all the formal methods of investigations, including but not limited to, electronic surveillance, visual surveillance, general questioning of witnesses, search warrants, confidential informants, pen registers, trap and trace, and the use of undercover agents. Moreover, I have authority to execute and serve search warrants issued under authority of the United States, pursuant to Title 21, United States Code, Section 878.

### III. **GENERAL INFORMATION**

5.    The information contained in this affidavit is based upon

2

1  the investigation I have personally conducted, the handling or
2  debriefing of Confidential Sources who have participated in this
3  investigation and with my conversations with other law enforcement
4  officers involved in this investigation, my personal knowledge and my
5  training.

6      6.    The information set forth in this affidavit is not intended
7  to detail each and every fact and circumstance of the investigation or
8  all information known to me and other investigators involved.  Rather,
9  this affidavit sets forth facts sufficient to establish probable cause
10  to obtain the arrest and search warrants requested.  Therefore, I have
11  not included every fact known to me about the investigation.  However,
12  no facts known to me that could potentially mitigate a finding of
13  probable cause have been excluded.

14     7.    I believe that the records and items sought will corroborate
15  the information set forth in this affidavit, further implicate the
16  target individuals as a result of this investigation, and implicate
17  other persons who could be arrested and charged with drug trafficking
18  and related crimes.  Based upon my training and experience, and my
19  conversations with experienced narcotics investigators involved in
20  this investigation, I know that:

21         a.    Drug traffickers use their residences along with other
22  locations to serve different  functions so that customers, thieves,
23  and law enforcement personnel do not learn about any one location
24  where large quantities of methamphetamine, cocaine, marijuana, money,
25  and/or other drug related assets are stored.  These various locations
26  may be used to store narcotics, money, and/or drug related assets.
27  They may also be used to meet customers and/or as "safe houses;"
28         b.    Traffickers commonly "front" drugs to their customers
   by providing narcotics prior to receiving payment.  Traffickers are

3

known to maintain books, records, customer lists, receipts, notes, ledgers and other papers relating to the transportation, ordering, sales and distribution of controlled substances and equipment, even though such documents may be in code.  The aforementioned books, records, receipts, notes, ledgers, etc., are commonly  maintained in places where drug traffickers have ready access to them, e.g., their residences, offices, and automobiles over which they exercise control and/or dominion.  Traffickers commonly keep evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money made from engaging in drug trafficking activities in their residences, offices, garages, storage buildings, automobiles, and safe deposit boxes;

c.   Traffickers frequently rent storage lockers to store controlled substances and that the traffickers often have in their immediate possession or in their residences, keys, receipts, and other documents evidencing the rental of said storage lockers;

d.   Traffickers commonly maintain in their residences or vehicles' addresses or  telephone numbers in books or papers that reflect names, addresses, and/or telephone numbers for their associates in the drug trafficking organization, even if said items may be in code;

e.   Traffickers often store information regarding their drug trafficking on computer  databases.  This information may be as simple as customer lists and may be as elaborate as as documenting current transactions relating to narcotics trafficking;

f.   Unexplained wealth is probative of criminal activity,

4

including the trafficking of  controlled substances;

g.    Traffickers frequently continue their criminal activity over months and even years.   The traffickers typically will obtain and distribute controlled substances on a regular basis, much as any distributor of a legitimate commodity would purchase stock for sale. Such drug traffickers will also have an "inventory" of narcotics that will fluctuate in amount depending on the demand for the product;

h.    Traffickers keep receipts of illegal activities for a period of time extending beyond the time during which they actually possesses illegal controlled substances, in order that they can maintain contact with their criminal associates for future drug transactions, and so that they can have records of prior transaction for which, for example, they might still be owed  money, or might owe someone else money.   In my conversations with more experienced agents, I have become aware of cases in which traffickers have maintained evidence of prior drug trafficking transactions for three years after concluding those transactions;

i.    Persons involved in large scale drug trafficking organizations conceal at their residences or in vehicles, caches of drugs, drug paraphernalia, amounts of jewelry, automobile titles, financial documents, and other items of value and/or proceeds of drug transactions and evidence of  financial transactions relating to obtaining, transferring, secreting or spending large sums of money acquired from engaging in narcotics trafficking activities;

j.    Drug traffickers often maintain at their locations, including the residences where they live and the vehicles they drive

5

in, money ledgers, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, records and other documents noting the price, quantity, and/or times when narcotics were obtained, transferred, sold, distributed, and/or concealed; that drug traffickers also maintain drug paraphernalia such as "cutting" materials, weighing devices, miscellaneous containers, and measuring devices which are used to facilitate the distribution of narcotics;

k.    That drug traffickers possess DMV registration and ownership records of "load cars" used to transport narcotics; and that these items are maintained and kept by the narcotics trafficker in much the same way legitimate businesses will maintain their "tools of the trade," whether or not there is contraband in the vehicle on a given day. In addition Drug traffickers commonly utilize their vehicles that are located at their premises to transport and/or maintain narcotics hidden within the vehicle as well as maintain indicia that is related to their drug trafficking activities;

l.    When drug traffickers amass large quantities of cash from the sale of drugs, the drug traffickers often attempt to legitimize these profits through the use of banks and financial institutions and their attendant services that include accounts, securities, traveler's checks, cashier's checks, money orders, wire transfers, stock certificates, bonds, certificates of deposit, and safety deposit boxes.   Traffickers use vehicles they have access to transport this cash and related documents;

m.    Drug traffickers often place assets in names of relatives and close friends or fictitious names, in order to avoid

6

detection of those assets by law enforcement agencies; and that even though these assets are in other persons' names, the drug dealers retain records, documents, and deeds reflecting the purchase of those assets while continuing to use those assets and exercise dominion and control over them;

n.   It is common practice for large scale narcotic traffickers to travel to their purchase and distribution areas to facilitate their trafficking; that after purchasing drugs, narcotic traffickers will transport or cause to be transported narcotics to areas in which they will distribute the drugs; and that methods of transportation include commercial airlines, private airplanes, trains, rental and private automobiles, and government and contract mail carriers;

o.   As described throughout this affidavit, the defendants extensively used cellular phones to facilitate their drug trafficking activity.  Drug traffickers use telephones, portable cellular phones, pagers and other communication devices and maintain telephone and address books, telephone bills and other books and papers which reflect names, addresses, and/or telephone numbers of their associates in the narcotic trafficking organization and customers of narcotics;

p.   Drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their product; and that these traffickers sometimes maintain these photographs in their residences or vehicles.  I have seen such photographs in trafficker's residences; and

q.   Drug traffickers commonly have in their possession,

7

that is on their persons, in  their vehicles and/or at their stash houses[1] firearms, including handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons, that are used to protect and secure the drug trafficker's property, including narcotics, narcotic paraphernalia, currency, jewelry, and records.

8.   Based upon my conversations with senior agents and in my experience conducting drug trafficking investigations, law enforcement knows that computers and other electronic equipment, including cell phones, are often used to maintain records of narcotic traffickers' illegal businesses.  Based upon my training, experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a.   Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are many types of computer hardware and software in use today; it is thus nearly impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to

---

[1] The term stash house refers to a particular location, oftentimes a rented house, apartment, or hotel room, wherein drug traffickers store or stash their supply of drugs and/or drug proceeds in an effort to prevent detection and seizure of the drug and/or money cache by law enforcement, or to prevent other persons from stealing the drugs and/or money.

8

conduct a thorough search.   In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

b.   Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data.   Computer hardware and storage devices   may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.   Because computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment with a computer technician, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c.   The volume of data stored on many computer systems and storage devices is typically too large to feasibly search for data during the execution of the physical search of the premises at the time of warrant execution.   A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.   A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.   Storage devices capable of storing fifteen gigabytes of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 7.5 million pages of data, which, if printed out, would completely fill a 10' x 12' x 10' room to

9

the ceiling.

d. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

### III. ITEMS TO BE SEIZED

9. The following are the items to be seized from Subject Premises and Subject Vehicles, which I believe constitute the fruits, instrumentalities, and evidence of violations of the Target Offenses:

a. controlled substances, including crystal methamphetamine, cocaine, marijuana, residue from said controlled substances, and paraphernalia associated with controlled substances including scales, measuring devices, and weighing devices;

10

b.   diluting or cutting agents used to dilute or cut controlled substances;

c.   packaging or manufacturing materials including wrappers, plastics, tin foil, cellophane, jars, plastic bag, balloons and containers used to package controlled substances and chemicals used to manufacture controlled substances;

d.   quantities of money in excess of $1,000 representing ongoing drug  trafficking or illegal activities or quantities of currency derived from the sale of controlled substances;

e.   money counting machines, money wrapper and rubber bands are known to  be utilized by drug traffickers to count, organize and conceal large sums of currency which either represent the proceeds from drug sales or are intended for the purchase of controlled substances;

f.   narcotics ledgers or money ledgers, narcotics distribution or customer lists, narcotic supplier list, correspondence, notation logs, receipts, journals, books, pay and owe sheets, records, and other documents noting the price, quantity, dates, and/or times when narcotics and/or chemicals used to manufacture narcotics were purchased, possessed, transferred, distributed, sold or concealed;

g.   bank account records, wire transfer records, back statements, safe deposit box  keys and records, money containers, financial records and notes showing payment, receipt,  concealment,

transfer, or movement of money generated from the sale of controlled substances;

　　　　h.　　personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, documents and other items reflecting names, addresses, telephone numbers, and communications regarding illegal activities among and  between members and associates involved in drug trafficking activities;

　　　　i.　　documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry or other items obtained with the proceeds of drug trafficking activities;

　　　　j.　　records of off-site locations to store records, including safe deposit box keys, records and receipts and rental agreements for storage facilities;

　　　　k.　　records of mail and communications services, telephone pagers, answering machines, telephone paging devices, beepers, car telephones, cellular telephones and other communication devices which evidence participation in drug trafficking activity;

　　　　l.　　records, items and documents reflecting travel for the purpose of participating in drug trafficking or money laundering activities, including passports, airline tickets, vehicle rental receipts, DMV registration and ownership records, credit card receipts, hotel and restaurant receipts, cancelled checks, maps and records of long distance calls reflecting domestic and foreign travel;

m.    indicia of occupancy, residency or ownership for the Subject Premises or any other identified in the affidavit and things described in the warrant, including utility bills, telephone bills, loan payment receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents and keys;

n.    mementos including photographs and other historical keepsake items which document the association of the Target Subjects with each other and other suspected drug traffickers.

10.    The records, documents, programs, applications or materials listed above include records, documents, programs, applications or materials created, modified or stored in any form, including, but not limited to, electronic format.

11.    In searching for electronic data capable of being read, stored or interpreted by a computer, cellular telephone, pager or other electronic memory device, law enforcement personnel executing this search warrant will employ the following procedures:

a.    Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices to determine whether these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data;

b.    If the computer personnel determine it is not practical to perform an on-site search of the data within a reasonable amount of time, then the computer equipment and storage devices will be seized

13

and transported to an appropriate law enforcement laboratory for review. The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein;

c. In searching the data, the computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein. In addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

d. If the computer personnel determine that the data does not fall within any of the items to be seized pursuant to this warrant or is not otherwise legally seized, the government will return these items within a reasonable period of time not to exceed 60 days from the date of seizure unless further authorization is obtained from the Court;

e. In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

i. Any computer equipment and storage device capable of being used to commit, further or store evidence of the offense listed above;

14

ii.  Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

iii. Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

iv.  Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

v.   Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

vi.  Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

vii. Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

1

**IV. SUMMARY OF INVESTIGATION**

2      12.   Based upon information developed from Agents of the Drug
3  Enforcement Administration of the Oakland Resident Office, Victor
4  TORRES is a multi-drug trafficker. On August 4, 2010, under the
5  direction and control of agents, a Confidential Source hereafter
6  referred to as (CS) coordinated with TORRES by contacting TORRES's
7  cell phone in order to meet in Modesto to purchase one pound of
8  methamphetamine from TORRES for approximately $12,500.00. During the
9  drug transaction between the CS and TORRES, TORRES introduced the CS
10 to a co-conspirator who was later identified as Fernando QUINTERO.
11 Subsequently, agents initiated a Title, III wire intercept of TORRES's
12 known target telephone on January 28, 2011. On February 18, 2011, the
13 CS contacted TORRES in order to conduct a second one pound purchase of
14 methamphetamine with TORRES.  TORRES was unable to meet the CS on that
15 day and coordinated the drug transaction with another co-conspirator
16 who was later identified as Alfonso ESTRADA. On the same day the CS
17 met with ESTRADA and purchased one pound of methamphetamine from
18 ESTRADA in a parking lot within the City of Salida, California for
19 approximately $12,000.00. Agents initiated a Title, III wire
20 intercept of ESTRADA's known target telephone on April 18, 2011.  On
21 August 18, 2011, the CS contacted QUINTERO and coordinated the
22 purchase of one pound of methamphetamine with QUINTERO. On that same
23 day, the CS and QUINTERO met at a parking lot within the city of
24 Madera and purchased one pound of methamphetamine from QUINTERO for
25 $10,700.00. Based upon telephone conversations between the CS and
26 TORRES during mid September 2011, agents have been able to confirm
27 that TORRES continues to facilitate drug trafficking activities.

28

**V.   PURPOSE OF AFFIDAVIT AND APPLICABLE LAW**

16

13.  This affidavit is made in support of a criminal complaint charging **Victor Manuel TORRES, Fernando QUINTERO,** and **Alfonso Minjares ESTRADA** in violation of the following offenses against the United States:

a.  possession of a controlled substance with intent to distribute, to wit: methamphetamine (in violation of Title 21, United States Code, §841(a) (1));

b.  conspiracy to commit any of the above offenses (in violation of Title 21, United States Code, §846));

c.  use of a communication facility during or in relation to a drug trafficking offense (in violation of Title 21, United States Code, § 843(b).

14.  It is also made for the purpose of obtaining search warrant for the following:

a.  **SUBJECT PREMISE:** The residence of suspect Fernando QUINTERO, located at 851 W. Rialto Avenue, Clovis, California. I believe that Fernando QUINTERO resides at this address for the following reasons: observations from surveillance as late as August 18, 2011, as described in this affidavit, and GPS location data at various times before that date. In addition, DMV records show that QUINTERO's driver's license gives his residence address as 851 W. Rialto Avenue, Clovis, California (the SUBJECT PREMISE).

b.  **SUBJECT VEHICLE 1:** A 2009 red Nissan Altima with California license plate 6KLM808 registered to QUINTERO's significant other, Quintilia QUINTERO, at the SUBJECT PREMISE (QUINTERO's residence). (Quintilia is suspected to be Fernando QUINTERO's significant other based on DMV and phone records, and Quintilia's last name being "QUINTERO."). Surveillance has observed Fernando QUINTERO driving

17

1  SUBJECT VEHICLE 1 throughout the investigation up until he obtained
2  SUBJECT VEHICLE 2, identified below. QUINTERO used SUBJECT VEHICLE 1
3  to drive to a controlled purchase of methamphetamine on August 4,
4  2010. Since that time, the vehicle remains registered to QUINTERO's
5  significant other. The vehicle has been observed at QUINTERO's
6  residence as late as August 18, 2011. I believe QUINTERO continues to
7  exercise control over this vehicle, and evidence of narcotics
8  trafficking may be found in it.

9       c.  **SUBJECT VEHICLE 2**: A 2011 burgundy in color Ford Explorer
10  with California temporary dealer license plate (registered owner
11  unknown due to temporary license plate). Surveillance has observed
12  QUINTERO driving SUBJECT VEHICLE 2 since about the end of July or
13  beginning of August. QUINITERO used this vehicle on August 18, 2011 to
14  transport methamphetamine for sale to the CS. Prior to the drug
15  transaction, the vehicle was seen parked at QUINTERO's residence (the
16  SUBJECT PREMISE). I believe QUINTERO continues to exercise control
17  over this vehicle, and evidence of narcotics trafficking may be found
18  in it.

19      This SUBJECT PREMISE and SUBJECT VEHICLES, and their utilization
20  in drug trafficking, are detailed further in this affidavit and in
21  Attachment A-1, which is attached and incorporated fully herein by
22  reference.

23                  **VI.  DETAILS FOR PROBABLE CAUSE**

24      15.  This investigation was initiated as the result of the Drug
25  Enforcement Administration (DEA) Oakland Resident Office's
26  investigation of Victor TORRES and his co-conspirators, in which
27  TORRES is believed to operate a multi-drug, Drug Trafficking
28  Organization (DTO).  This investigation was developed with a proven

1 reliable source. I am aware that this confidential source, hereafter
2 referred to as (CS), has provided information in the past that has
3 initiated several investigations, the seizure of over 40 pounds of
4 crystal methamphetamine, over 10 pounds of heroin, and 9 arrests. The
5 CS has been reliable and truthful.

6        16.   During the month of April 2010, the CS met with the
7 suspected methamphetamine drug trafficker known as Victor TORRES.
8 Based upon the information the CS gathered from his/her conversation
9 with TORRES that day, the CS informed me that TORRES is a member of
10 the Mexican Cartel or "Family" and he is head of a large scale Drug
11 Trafficking Organization (DTO). According to the CS, TORRES is able to
12 transport and distribute up to 50 pounds of methamphetamine from the
13 U.S. Mexican border.  TORRES informed the CS that he keeps some of his
14 drugs at his ranch which is located at 20556 Everett Ave, Riverdale,
15 CA.   TORRES told the CS that he would sell him/her methamphetamine for
16 $14,500.00 a pound and $24,000.00 for a kilogram of cocaine.   TORRES
17 informed the CS to call him on his Nextel Push-To-Talk (PTT) phone
18 number and to use the code word "Silla" the Spanish word for "saddle"
19 and the amount of drugs he/she wanted to purchase.

20        17.   In July 2010, TORRES was contacted by a CS under the
21 direction and control of agents.  This conversation was recorded and
22 monitored.   During that conversation the CS and TORRES had agreed to
23 meet in Modesto, CA to conduct a one pound of methamphetamine
24 transaction for $11,250.00. According to the CS, TORRES said that the
25 pound of methamphetamine would cost $11,000.00 dollars and an
26 additional $500.00 for the transport of the drugs to Modesto. TORRES
27 told the CS that he would split the $500.00 with the CS so each would
28 only pay $250.00, bringing the total cost of the methamphetamine to

1    $11,250.00.

2    **A.   Controlled Purchase of Methamphetamine Involving TORRES and**
3    **QUINTERO (August 4, 2010)**

4        18.   On August 4, 2010, under the direction and control of the
5    agents the CS coordinated with TORRES by contacting TORRES's PTT
6    number in order to meet in Modesto, this conversation was recorded.
7    During this conversation TORRES told the CS that TORRES was
8    coordinating with his driver, who had the pound of methamphetamine to
9    meet at an undisclosed location in Modesto, CA. Ultimately, the CS and
10   TORRES agreed to meet each other at a Burger King parking lot off of
11   East Hatch Road, Ceres, CA between 7:00 pm and 7:30 pm.   Prior to the
12   transaction, the agents searched the CS and his/her vehicle in
13   accordance with standard practice and procedures, and confirmed that
14   neither he/she, nor his/her vehicle contained any narcotics or
15   contraband. The CS was also equipped with a recording device for
16   his/her safety and for evidentiary value.   At approximately 7:24 pm,
17   the CS arrived in the Burger King parking lot and met with TORRES.

18       19.   During their meeting, TORRES wanted to introduce the CS to
19   someone that he worked with. He told the CS that this person can get
20   the CS up to 10 lbs of methamphetamine at any time. TORRES also said
21   if he was around he could also bring methamphetamine up from Mexico
22   for the CS as well. At approximately 7:33 pm, a red 2009 Nissan Altima
23   with California license plate 6KLM808 **(SUBJECT VEHICLE 1)**, registered
24   to Quintilia Quintero at the **SUBJECT PREMISE (QUINTERO's residence)**,
25   arrived in the parking lot.   The driver of the Altima, **later**
26   **identified as Fernando QUINTERO**, exited the vehicle and met with the
27   CS and TORRES. The CS stated that TORRES introduced QUINTERO to
28   him/her.   QUINTERO gave the CS his cell phone number of 559-333-2324
     and told the CS to ask for "JOYAS" (Spanish for jewels).   QUINTERO

                                    20

told the CS that he can get the CS the methamphetamine he/she needs. QUINTERO also said that he has drivers that can deliver drugs loads as far as San Francisco if the CS wanted it there.

20.   TORRES and QUINTERO wanted to move to a different location to avoid detection; specifically, they thought they were at the Burger King parking lot for too long and that the business may have cameras. At approximately 7:50 pm, TORRES, QUINTERO, and the CS drove their respective vehicles to the nearby Starbucks located at 1427 Herndon, Ave, Modesto, CA.  While they waited for the load vehicle containing the drugs to arrive, the CS observed QUINTERO talking on his phone giving directions to Starbucks for the load vehicle.

21.   At approximately 8:03 pm, a blue 2005 GMC pickup truck with California license plate 8M20265, registered to Samuel Ramirez Ayala at 493 W Mountain View Ave, Caruthers, CA 93609 arrived in the Starbucks parking lot and parked near the 2007 black Cadillac and SUBJECT VEHICLE 1 (Nissan).  The GMC had two unidentified Hispanic Male Adult (HMA) occupants.  The occupants of the GMC—QUINTERO, TORRES, and the CS—all met in the Starbucks parking lot.  This meeting was observed by SA Brian Neil.

22.   During this meeting, the CS gave TORRES $12,500 U.S. currency and a promise of future payment in exchange for one pound of methamphetamine that was placed into the CS's vehicle.  TORRES asked the CS to place the money into his back seat of TORRES' 2007 black Cadillac.  The driver of the GMC opened the front passenger side door, reached in and pulled out a black laptop case.  The driver then placed the laptop case into the CS's vehicle on top of the car seat. At approximately 8:08 pm, the meeting ended and everyone entered their respective vehicles and departed the Starbucks parking lot.

23. In addition, surveillance units followed QUINTERO who was driving SUBJECT VEHICLE 1 (Nissan), and observed QUINTERO arrive at 851 W Rialto Avenue in Clovis, **(the SUBJECT PREMISE)** (QUINTERO's residence), at approximately 10:23 pm. Surveillance units also followed the SUBJECT VEHICLE 2 (GMC) away from Starbucks. The SUBJECT VEHICLE 2 (GMC), also traveled to the SUBJECT PREMISE, and arrived at approximately 10:00 p.m.

24. Immediately after the drug transaction on August 4, 2010, the CS drove his vehicle to a predetermined location, and was followed by agents to ensure the integrity of the evidence in accordance with standard practices and procedures. At that location, the CS met with your affiant and handed over the black laptop case to SA Brian Keenan and me. Inside the interior pocket of the case was a square shaped Tupperware container with a blue lid wrapped in plastic wrap. Inside the container was a clear white in color crystal like substance suspected to be methamphetamine with a total gross weight of 556.9 grams. The DEA Western Laboratory positively identified the substance in the container to be methamphetamine.

## B. Controlled Purchase of Methamphetamine Involving TORRES and ESTRADA (February 18, 2011)

25. On January 27, 2011, the Honorable Judge Lawrence J. O'Neill of the United States Eastern District of California authorized a court order for the interception of wire communications of TORRES' Target Telephone (559) 469-1358, (Case No. 1:11 SW 00018 LJO).

26. On February 17, 2011, agents requested that the DEA CS contact TORRES via his Targeted Telephone, (559) 469-1358, in order to coordinate the future purchase of one pound of crystal methamphetamine the following day. This call occurred at approximately 3:49 p.m.

During the above mentioned intercepted call, TORRES informed the CS that he had to do a construction bid to build a dental office within the Fresno area and may not be available to meet the CS. However, TORRES told the CS that the CS could meet his cousin "Armando" in Modesto, California to conduct the drug transaction if TORRES would be unavailable.

27.   On February 18, 2011, agents requested that the DEA CS contact TORRES via his Targeted Telephone, (559) 469-1358, in order to purchase one pound of crystal methamphetamine. This call occurred at approximately 8:20 a.m.  During the above mentioned intercepted call, TORRES confirmed with the CS that TORRES will have an individual from Modesto, CA give the CS a call who will be able to give the CS the methamphetamine that same day, because TORRES would be busy conducting a legitimate construction bid in Fresno, CA.

28.   That same morning, the CS received a phone call from telephone number (209) 345-6580.  The voice on the phone identified himself as "Armando", and told the CS that he had spoken to the guy from Fresno and knows that the CS is looking to buy some "roosters". The CS told "Armando" that he/she wanted "one pure rooster" to see how it looks.  Based on the CS' experience dealing with DTOs in coded language to coordinate the purchase/distribution of controlled substances, the CS was able discern that the word "rooster" was coded language for crystal methamphetamine. "Armando" was later identified as **Alfonso Minjares ESTRADA** (see ¶ 42-45), **hereafter "Armando" will be referred to as ESTRADA.**  During this same conversation the CS asked ESTRADA if they could meet around 2:00 p.m., and that the CS would call ESTRADA when he/she arrived in Modesto, CA.  ESTRADA agreed to meet the CS to conduct the drug transaction.

29.   Prior to the transaction, the agents searched the CS and his/her vehicle in accordance with standard practice and procedures, and confirmed that neither he/she nor his/her vehicle contained any narcotics or contraband. The CS was also equipped with a recording device for his/her safety and for evidentiary value.   Later during the same day, at approximately 2:45 p.m., the CS received a phone call from ESTRADA's telephone, this conversation was not recorded.   ESTRADA asked the CS where he/she was parked and what car he/she was in.   The CS told ESTRADA that he/she was parked in front of a Del Taco and was driving a black SUV.   The Del Taco Restaurant was located at 4300 Salida Ave, Salida, CA. ESTRADA said he would be there any minute and that he was driving a Honda.

30.   At approximately 2:46 p.m., a blue 2004 Honda Accord with California license plate 6LHR659 arrived at the CS' location and parked parallel to the CS' vehicle.   SA Brian Neil observed two HMAs in the Honda Accord.   The HMA seated in the front passenger seat exited the blue Honda and walked over to the CS' front passenger door.   The HMA was wearing a grey in color sweater jacket and blue jeans.   The HMA then entered the CS' vehicle and sat in the passenger seat with the CS seated in the driver seat of vehicle.   This meeting was recorded and monitored. The HMA told the CS that his name was "Armando"(ESTRADA) and that he had spoken to "the guy" in Fresno, CA. Your affiant believes based on the phone conversations that "the guy" ESTRADA was referring to, is TORRES.   The CS told ESTRADA that he/she would want to buy 15 to 20 pounds of methamphetamine in the next few weeks and wanted to know if ESTRADA could supply him with that amount of methamphetamine.   ESTRADA told the CS that he gets 5 lbs. of methamphetamine every few days and could also get the CS up to 20

24

pounds.  ESTRADA told the CS that he would need 3 or 4 days to put that amount of methamphetamine together for the CS.  While inside the CS' vehicle, ESTRADA pulled up his sweater jacket and tucked under was a Ziploc bag containing a crystal like substance, suspected to be methamphetamine.  This event was also captured on video by the CS' video recording device which was placed on his/her person prior to their drug transaction.  The CS told ESTRADA that the money was in his/her trunk in a backpack.  ESTRADA grabbed the backpack that contained $12,000.00, opened the backpack and pulled out the money.  ESTRADA counted the money on his lap and placed it in his pocket.  The CS asked ESTRADA for his contact number to so they could talk about future drug transactions.  ESTRADA told the CS that he/she could contact him through  his telephone number (209) 345-6580.  ESTRADA got out of the CS' vehicle and returned to the blue Honda where the unknown HMA remained seated in the driver's seat of the blue Honda during the whole transaction.  At approximately 3:05 p.m., the vehicle occupied by the HMA and ESTRADA left the area.

    31.  Immediately after the drug transaction on February 18, 2011, the CS drove his vehicle to a predetermined location and was followed by agents to ensure the integrity of the evidence in accordance with standard practices and procedures.  At that location the CS met with your affiant and SA Neil and handed over a Ziploc bag.  Inside the Ziploc bag was a clear, white in color crystal-like substance suspected to be methamphetamine with a total gross weight of 493.2 grams.  Agent Mulligan conducted a field test of the suspected drugs, which indicated a positive for methamphetamine.  In addition, the DEA Western Laboratory positively identified the substance in the Ziploc bag to be methamphetamine.

32.  On April 25, 2011, at approximately 12:19 AM, under the direction and control of the agents the CS placed a call to ESTRADA. This conversation was intercepted pursuant to a Eastern District of California, Title III wire tap court order.  This intercepted conversation between the CS and ESTRADA was in Spanish and the following is a non-verbatim summary of that conversation. ESTRADA told the CS that "there are a lot of young men and the weather is great to work." Given the context of the conversation, agents believe ESTRADA was speaking in code to the CS and is informing the CS that he has a lot of methamphetamine available to sell to the CS. The CS asked if ESTRADA would be able to sell the CS 20 lbs of methamphetamine in the near future. ESTRADA informed the CS that he would check with a third party, possibly ESTRADA's Source of Supply (SOS) to see if he can get the CS 20 pounds and to see how much it would cost per pound at that quantity. ESTRADA told the CS that he would try to see if he can get the price lowered and would call him/her back. The CS related to ESTRADA that he/she would give ESTRADA a few days notice before he/she was ready to purchase the drugs from ESTRADA.

## C.    Controlled Purchase of Methamphetamine Involving QUINTERO (August 18, 2011)

33.  On August 18, 2011, Agents from the DEA Oakland Resident Office, ICE San Francisco Office, Fresno Methamphetamine Task Force, and detectives from Richmond Police Department conducted a second controlled purchase of approximately one pound of crystal methamphetamine for $10,700.00 U.S. currency from Fernando QUINTERO at a Starbucks parking lot located at 2295 Market Place Drive, Madera, California.

26

34. On August 18, 2011, at approximately 11:50 AM, SA Keenan directed the CS to place a call to QUINTERO. This call between the CS and QUINTERO was recorded and monitored. The CS called QUINTERO's PTT 117*489*9104. The CS told QUINTERO he/she was going to be in Madera and that he/she wanted "one" meaning one pound of methamphetamine. QUINTERO told the CS that it would cost approximately $11,000. At approximately 12:03 PM, surveillance units observed a burgundy Ford Explorer with temporary dealer license plates, **(Subject Vehicle 2)**, arrive at the SUBJECT PREMISE (QUINTERO's residence). TFA Wages observed QUINTERO exit the vehicle, SUBJECT VEHICLE 2 (Ford), and walk on the side of the house (the SUBJECT PREMISE) toward the back patio. At approximately 12:05 PM, TFA Wages observed QUINTERO walk back to the passenger side of SUBJECT VEHICLE 2 (Ford). QUINTERO was observed carrying a black box with a red lid, which QUINTERO did not have before going to the residence. QUINTERO was then observed returning back to the back patio area still carrying the black box. At approximately 12:15 PM, TFA Wages observed QUINTERO walk back to SUBJECT VEHICLE 2 (Ford) and place something into the vehicle. At approximately 12:16 PM, TFA Wages observed QUINTERO return to the rear of the residence carrying a black nylon-type bag.

35. At approximately 12:39 PM, TFA Robles observed QUINTERO return to the SUBJECT VEHICLE 2 (Ford), and place a black bag into the tailgate area of SUBJECT VEHICLE 2 (Ford). TFA Robles observed QUINTERO place the bag in the area underneath the rear seats of the vehicle. At approximately 12:40 PM, TFA Wages observed QUINTERO get into SUBJECT VEHICLE 3 (Ford), and drive away from the area. At approximately 12:52 PM, under the direction and control of agents, the CS placed a recorded call to QUINTERO's phone and told QUINTERO he was

27

1  at the Starbucks, in Madera.  Prior to the transaction, the agents

2  searched the CS and his/her vehicle in accordance with standard

3  practice and procedures, and confirmed that neither he/she nor his/her

4  vehicle contained any narcotics or contraband. The CS was also

5  equipped with a recording device for his/her safety and for

6  evidentiary value while the CS and QUINTERO conducted the drug

7  transaction.

8      36.  At about 1:11 PM, TFA Wages observed SUBJECT VEHICLE 2

9  (Ford) arrive at the Starbucks located at 2295 Market Place Drive,

10  Madera, California. TFA Wages observed QUINTERO and the CS meet near a

11  Honda in the parking lot.  QUINTERO and the CS got into the CS's

12  vehicle.  At about 1:20 PM, TFA Wages observed QUINTERO exit the

13  vehicle and walk in the direction of SUBJECT VEHICLE 2 (Ford).

14  QUINTERO then opened the tailgate of the vehicle to gain access to the

15  rear of SUBJECT VEHICLE 2 (Ford), and retrieve a black bag.  QUINTERO

16  walked back to the CS's vehicle with the bag.  Shortly thereafter, TFA

17  Wages observed QUINTERO walk back to SUBJECT VEHICLE 2 (Ford), and

18  drive away from the area. Surveillance followed QUINTERO to a

19  residence in Fresno, CA where he spent about half an hour before

20  returning home. QUITERNO drove his car (SUBJECT VEHICLE 2) back to his

21  house (the SUBJECT PREMISE), arriving home at about 2:34 PM.

22      37.  Immediately after the drug transaction on August 18, 2011,

23  the CS drove his vehicle to a predetermined location and was followed

24  by agents to ensure the integrity of the evidence in accordance with

25  standard practices and procedures. At that location the CS met with SA

26  Brian Neil and SA Brian Keenan.  The CS provided SA Keenan

27  approximately 1 pound of suspected methamphetamine.  The

28  methamphetamine was inside a Ziploc bag which was inside a plastic

container with a red lid.   The substance within the Ziploc bag was a clear crystal like substance similar to crystal methamphetamine which was a total gross weight of 551.1 grams.

**D.   September 2011 – Phone Calls Between Torres and the CS**

39.   On September 13, 2011 under agents' direction the CS spoke to TORRES on his known cell phone during the afternoon hours. This conversation was neither recorded, nor monitored. During this conversation, the CS and TORRES discussed a future methamphetamine deal and TORRES told the CS that TORRES does not sell methamphetamine anymore, but that TORRES was willing to facilitate a methamphetamine transaction by way of introduction.

40.   On September 16, 2011, at approximately 12:26 PM under the direction and control of SA Brian Keenan, the CS placed a recorded call to TORRES.   During this conversation TORRES told the CS that TORRES had informed the individual who is currently selling methamphetamine about the CS and that this person would call the CS later in the day.   TORRES also told the CS that TORRES would call the CS later in the day.   It should be noted that the CS has not yet received a call from TORRES's methamphetamine contact.

**E.   TORRES'S Residence – 20556 Everett Avenue, Riverdale, California**

41.   I have determined that Victor TORRES is still residing at 20556 Everett Avenue, Riverdale, CA., based upon the following reasons: observations from surveillance, GPS location data of TORRES's known cell phone, pole camera observations, and other records, property ownership information.   Though I am not seeking a search warrant for this location at this time, I believe TORRES will likely be found there.

**F.   ESTRADA'S Identification and Residence – 3037 10th Street, Apartment 5, Ceres, California**

42. I have determined that Alfonso ESTRADA resides at 10th Street, Apartment 5, Ceres, California, based upon the following reasons: observations from surveillance, as described in this affidavit, GPS location data, California DMV drivers license records, pole camera observations, and other records. Though I am not seeking a search warrant for this location at this time, I believe ESTRADA will likely be found there.

43. Based upon information gained from an administrative subpoena served on Sprint/Nextel for subscriber information for ESTRADA's known telephone number, Sprint/Nextel provided the following information: (209) 345-6580 is subscribed to Quvellar Bonner, purportedly residing at 3037 10th Street, Apartment 5, Ceres, CA. Based upon training and experience, I know narcotic traffickers often use fictitious names or use other individuals names as a method to hide their identity when purchasing a phone or registering a telephone number and subscriber with the phone company in order to evade law enforcement detection.

44. Agents have conducted a query on multiple data bases of Quvellar Davon Bonner. California DMV records reveal valid driver's license # D7874412 is issued to Quvellar Davon Bonner at 3037 10th Street, Apartment 5, Ceres, CA. Criminal justice databases reveal no· criminal history for this person. A DMV photograph of this person depicts a black male, which is inconsistent with what law enforcement has observed at the residence, 3037 10th Street, Apartment 5, Ceres, CA. Throughout this investigation surveillance has shown that the occupants of the residence at 3037 10th Street, Apartment 5, Ceres, CA., are primarily Hispanic. However, California DMV records also reveal expired (previously suspended and subsequently revoked)

driver's license # B3573177 was issued to Alfonso Minjares ESTRADA at 3037 10th Street, Apartment 5, Ceres, CA. This address was reported on September 10, 2010. Physical description: male, birth date 8/15/1975, 5'8" tall, brown eyes, black hair. On March 9, 2011, your affiant and Intel Analyst (IA) Matthew G. Vurek reviewed video taken on February 18, 2011 during the controlled.purchase of 1 pound of methamphetamine from ESTRADA in Salida, California. The video revealed that the individual initially identified as "Armando" (and later identified as ESTRADA), was missing the ring finger from his right hand and the same individual on the video strongly resembled the California driver's license photo of ESTRADA as well as an August 2010 arrest photo of ESTRADA. In addition, ESTRADA's criminal record section under scars, marks, and tattoos report that ESTRADA is missing his right ring finger. Based upon the previously stated facts, I was able to conclude that the identity of ARMANDO is in fact Alfonso Minjares ESTRADA.

45. On September 28, 2011, surveillance was conducted at Alfonso ESTRADA's residence at 3037 10th Street, Apartment 5, Ceres, CA. SA Brian Neil observed that the overhead garage door was open and that there was a small red pick-up with no license plate and a white and blue two tone pick-up truck bearing CA License plate 7HO3333 connected to a small trailer containing various lawn care tools parked directly in front of Apartment # 5. These vehicles have been seen at this location throughout this investigation and are believed to be associated with this address. At approximately, 11:40 am, SA Neil observed a HMA matching the description of Alfonso ESTRADA walk into the front door of apartment # 5. At approximately, 1:00 pm, SA Brian Neil observed a Hispanic Female Adult (HFA) wearing pink pants walking

1   down the driveway of 3037 10th Street away from the area of apartment

2   # 5. According to SA Neil and SA Thompson the HFA matched the

3   descriptions of ESTRADA's suspected wife Tonya GOMEZ. Based upon the

4   previously stated observations established from surveillance and pole

5   camera, I believe there is sufficient information to conclude that

6   ESTRADA continues to reside at 3037 10th Street, Apartment 5, Ceres,

7   CA.

8                          **VII. CONCLUSION**

9       46.   Based on the foregoing, I respectfully submit that there is

10  sufficient probable cause to believe that Victor Manuel TORRES,

11  Fernando QUINTERO and Alfonso Minjares ESTRADA have knowingly

12  possessed with intent to distribute schedule I narcotics, such as

13  crystal methamphetamine and are in involved in trafficking controlled

14  substances. As previously stated within this affidavit that the

15  following individuals Victor Manuel TORRES, Fernando QUINTERO and

16  Alfonso Minjares ESTRADA  have committed one or more of the following

17  offenses: Title 21, U.S.C., Section 841(a)(1), distribution and

18  possession with intent to distribute a controlled substance, such as

19  methamphetamine, Title 21, U.S.C., Section 846, conspiracy to

20  distribute a controlled substance,  such as methamphetamine, and Title

21  21, U.S.C., Section 843(b), use of a communication facility during or

22  in relation to a drug trafficking offense will be discovered at the

23  location to be searched.

24  ///

25  ///

26  ///

27  ///

28      I declare under penalty of perjury that the statements above are

                                    32

1 | true and correct to the best of my knowledge and belief.

2

3

4

5

6

_____

Special Agent Chris Mulligan
United States Department of Justice
Drug Enforcement Administration

7

8 | Sworn and subscribed to before me
October 28, 2011

9

10 | _____

11 | Honorable Barbara A. McAuliffe
United States Magistrate Judge
Eastern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

33